Good morning, Judge Fuentes, and may it please the Court, I am David Frederick for the Patient Plaintiffs, and would like to reserve three minutes of time for rebuttal, if I may. This case arises in the context and in the aftermath of the Supreme Court's decision in Wyeth v. Levine, which generally rejected preemption of failure-to-warn claims for brand-name drug manufacturers, because of the basic proposition under federal law that brand-name drug makers are responsible for keeping their labels up-to-date. The Court recognized a very narrow exception, however, where there is, quote, clear evidence that the FDA would have rejected a proposed warning that would have addressed the theory of liability by the plaintiffs. Of course, you're going to get into what we should understand the term clear evidence to be. That's correct. And let me go right now to the key document in the case, which is in Appendix No. 1500. That document is entitled, A Complete Response, and it was sent by the FDA to Merck on May 22, 2009. This was about nine months after Merck had requested a label change and had proposed label language that used the word stress fracture in a number of instances, six instances, and had proposed having atypical femur fractures included in the adverse reaction section of the label, as well as in the precautions and warning section. This document is the best evidence of what the FDA's position was with respect to a label that would have addressed the atypical femur fracture problem. What do you make of the press release? The press release, let me, if I can, the press release that you're talking about would be in which period? 310. 310 is a period that, of course, comes after this document, and the press release was not, was in response to an ABC News expose, but I think can best be read as understanding that what the FDA was trying to do was to reassure the public not to immediately stop taking Fosamax while it was continuing to determine how best to work on the label. But this May 22nd document, the reason why it is so important for you is because under the regulations, and I would ask you and your clerks to take a look at a regulation that was not cited in the briefs, it's 21 CFR 314.110. That regulation says that when the FDA rejects language offered by a manufacturer, it has to give, quote, all reasons for the deficiencies that the FDA perceives, all reasons. And then what it does is it says you have to do this in what's called a complete response letter. That letter goes to the manufacturer, which the FDA sets out all of the reasons, and then the manufacturer has a chance to respond. Now, importantly, in this letter, this May So you're going to tell us the reasons. Yes. That the FDA provided the manufacturer. Yes. What are they? The reasons are, number one, we accept the change to the adverse reactions language. But as to the precautions language, quote, your justification for the proposed precautions section language is inadequate, identification of, quote, stress fractures may not be clearly related to the atypical subtrochanteric fractures that have been reported in the literature. Which page are you on, counsel? A1500. Okay. Okay. So the problem is that Merck used several times in its proposal the term stress fracture. About six times, if I'm correct. That's correct. And it did so in a way that the FDA found confusing, because if you look at, there are x-rays that are in the record. Let me ask you, though, is that because the issue was not so much stress fracture, but rather atypical femur fractures? That's correct. A stress fracture is a normal incidence, typically occurring by somebody who exercises frequently. It heals on its own with rest. These atypical femur fractures, and there are some pictures in the record before you, they're like these very sharp, like pencil-type fractures that occur with low energy, constant mechanical pressure. But what do you think the FDA would have done if Merck took that, its letter, and just substituted atypical femur fracture for the phrase stress fracture and resubmitted it? Judge Fuentes, you have asked the key question in the case. We don't know. We don't know what the FDA would have done had Merck given the right language to the FDA to consider. And therefore, under Wyeth v. Levine, and this is at 555 U.S. Reports 571, it can't meet the clear evidence standard. I'm trying to really understand. Is it because this term stress fracture has nothing to do with the use of Fosamax or the bisphosphonate category of drugs? What the FDA said later, and this is consistent with the ASBMR report, was that normal doctors, your basic general practitioner who's not an orthopedic surgeon, who's not looking at x-rays of these kinds of fractures, is going to be misled or not understand the relationship between use of the bisphosphonate and the atypical fracture that is occurring. That's why when Dr. Lane in 2005 reported to Merck about 25 cases of these atypical femur fractures, he said, we're calling these Fosamax fractures in the orthopedic surgeon community because they are so unusual. A stress fracture is a normal thing. Probably everybody in this courtroom has had one at one point in time or another. Can I just roll back for a minute? Before the letter at 1500, you have an email at 1498, which your adversary points to frequently, the April 15, 2009 email, where it says, hold off. Now, if the record only had that in it, would you concede that there was clear evidence of the use? No. No. That's not a rejection. Hold off is, we're still working the problem. That's very different from the benefit. So the defense's reaction wouldn't reasonably have been, we're going to hold off since it says hold off? No. The hold off is simply, particularly when you view it in the context of FDA's later explanations about the stress fracture language, is simply, wait a minute, we're prepared to accept it in the adverse reactions part of the label, but hold off because we're not comfortable with the language that you're proposing to be in the warnings and precautions. And that can't be clear evidence, your honor, of an FDA rejection. You're also asking them to look into a crystal ball. You're making reference to later memos. I'm talking about as of April 15, 2009. They're being told, don't. Don't do it. Let's work this thing out. Absolutely not. They're being told, hold off because we're not convinced that you have got it right on the language. And that's why when you look at the letter, the letter, which comes a month later, is under the regulations is the, quote, complete response. And so their theory of this case is that the response that the FDA made in its complete response letter rejected for scientific reasons, when that's not anywhere presented in the letter. Let me go back to this press release. I'm a very simple guy. So the press release comes out and says, hey, there's no clear connection between Fuzzimax and AFF. What's Merck supposed to do at that point? The clear connection is the phrase that the FDA uses. That is not what the regulatory standard is for having an adverse reaction or a warning. And remember, the FDA has already accepted the atypical femur fracture language in the adverse reaction section. That regulatory standard is much lower in terms of there being a belief, a reasonable belief that there could be an association. What the FDA is saying in the press release is we haven't shown causality. You should therefore continue to take Fuzzimax and we're going to continue to work with you. Even when, Judge Rusrepo, seven months later the FDA required a label change, in the announcement that accompanied the required label change, it said we still haven't proved causation, but we've met the regulatory standard for, quote, a reasonable basis in the evidence to determine that there is an association. The label has always got to be updated by the company because the company is in the best position to know what the evidence is out in the medical community. And so when the FDA is responding in a press release, that surely cannot, when it doesn't even use the right words of the regulations, that surely cannot trump the prior regulatory action. Because you asked for documents that occurred after all of this and we submitted those. I would urge you to look at the Eklund Exhibit 154, which was one of the later ones that we sent to you. In that one, in the summer of 2009, after this complete response letter, FDA says we're happy to talk to you further about the language, but we would require a formal meeting to do that. Could you, I see your time is running very quickly, could you discuss this idea of clear evidence that comes from the Wyeth case? Yes. I believe that clear evidence, the best evidence, is what is the official FDA reaction. And that's why I started my argument by asking you to look at A1500 because that complete response letter under the regulation 314.110 has to give all of the deficiencies that the FDA has identified. Just to put it in context, so it would be Merck's position that there was no clear evidence that the FDA would have accepted the plaintiff's proposed language in this case? So it's not the plaintiff's proposing the language. Merck has to propose the language and the burden is on them. Preemption is an affirmative defense. At the summary judgment stage, they have to prove that there is no reasonable evidence on the other side of the FDA. No clear evidence. Exactly. That's why when in Wyeth v. Levine, Justice Stevens' opinion goes into this, he says it's a very demanding defense because the point of this You say a very demanding defense. Is it a very demanding standard? Yes. To meet this in order to preempt. Because Judge Fuentes, what we're talking about is throwing these people out of court and not even allowing them to make their claim. I understand that, Mr. Frederick. But I've always understood clear evidence to be an evidentiary standard, a burden of proof. I've never understood it to be a legal doctrine. So there has to be some, as I understand it, some proof. And in the summary judgment context, isn't this a jury issue? Yes. Ultimately it is. And that's why the judge taking this away and not focusing on what the best evidence of the FDA's position. When the FDA is required by regulation to put all of the reasons and the only reason that it cites for rejecting the warnings and precautions language is we don't like the stress fracture reference. That is as clear evidence as you could have that FDA is not intending to preempt these claims. You say clear evidence again, but who decides the issue of clear evidence? Well, ultimately the court. I think it is a question, preemption is a mixed question of fact and law. At summary judgment, the question is, is there contested evidence that is presented if there is a disputed issue? You know you're confused. How is preemption become a question of fact? I've always thought of it as a question of law. It is a question of law in so far as it has a legal consequence. It is a question of fact as to what did the FDA do. We have to look at the facts of what did the FDA do. And that's why focusing on this document and you look at these other points, Judge Resrepo, and I can see that the language in that press release is a little bit unusual. But if you line up what the regulatory standard is and you understand the context of that press release, the FDA never rejected a warning that properly identified in words the atypical femur fracture that these patients were sustaining. Never. And in fact, the only time that it did get into a warning, it required a warning, and that was very clear from the late 2010 period. How would you define the standard? I would define the standard of clear evidence as evidence from which a reasonable person would determine that that is the only way to determine what the FDA's action was. And that's why these formal regulatory requirements are so critical. So the reasonable person can only come to one conclusion? That's correct. That's correct. I mean it's something beyond the preponderance of the evidence. It lies, it seems to lie somewhere between that and I guess proof beyond a reasonable doubt. The district courts are all over the place with this concept and we're trying to figure out how would you define that for a jury? I think the way you would define it at the summary judgment phase If there was a jury. Is determining what the evidence showed the FDA's action was. And where there's a dispute about that, where there's a dispute about that judgment, I think that the court surely is going to have to give some guidance to the jury in determining this. But that's why the regulatory requirements, and we should have had summary judgment for us on preemption in light of this evidentiary record. If you understand the context of this particular document, summary judgment should be ruled for the plaintiffs and we should be entitled to go on with the case and try to prove our claims. Thank you, Mr. Frederick. We'll get you back on the phone. Thank you. Mr. Beisner? Good morning. May it please the court. I'm John Beisner, counsel for Merck. Judge Fuentes, I'd like to start with the question that you were just addressing and that is whether this is a jury issue. And I would simply note to the court that on multiple occasions, this court in cases such as In Re Federal Mogul, Horne v. Thoratec Court, Taj Mahal Travel, and there are others, has clearly stated, I think as several of you have suggested, preemption is an issue of law. It is purely an issue of law. And I would recommend to the court two cases which came up after the briefing was complete, which I think are very helpful to understand this concept. One is a district court decision, In Re and Creighton-based therapies, product liability litigation, 142 FSEP, 3rd, 1108, Central District of California. And then there's a joint state court decision, which goes in more detail, In Re Biata cases, 2015, Westlaw, 7184655. Did you say that again? I'm sorry, Your Honor. 2015, Westlaw. Westlaw, 7184655. But those two courts, a federal district court and a state court, sitting together dealing with a mass court proceeding, spent a lot of time looking at this issue. And basically what they're saying is this is an issue of law. Like other issues courts deal with, like jurisdictional determinations and so on, the court has to sort through facts and make a determination. But it is a legal issue. But in this area, you've got a pretty high hill to climb, don't you? You've got something the Supreme Court calls clear evidence, and it's all through the prism of summary judgment, which means we've got to give all deference to the other side's position. But I think, Your Honor, there are no issues of contested fact here. The issue you have that the court has to deal with is the FDA record. What about the issue of whether the FDA has approved or not? That's a properly filed letter or request from Merck. Your Honor, that's right. And that's the clear evidence test that you all were referencing earlier. But that's a determination the court needs to make. That's the legal issue. You can debate about what all those documents mean. You agree that it's a question of fact, if I understood you correctly, but you say that the court has to make that determination. Well, Your Honor, you have to look at the facts to determine whether it meets the legal standard of clear evidence. That's what you have to do. Define the clear standard of legal evidence. Your Honor, the Supreme Court didn't define clear evidence. I think what it means is, is there clear evidence there? And that's what the court said, that it would have been rejected. Is there evidence there? I don't think it's a, could no jury have accepted it, getting into that sort of heightened level. So what's your best piece of evidence that a properly worded warning would have been rejected? Your Honor, I think there's a series of things, and some of which have not been mentioned and the plaintiffs have tried to ignore. I think the first thing is the document at A1970, the documentation of the conversation which Merck had in April 2009 with Dr. Monroe, who is a division director at the FDA, who said, Merck called, said, what's with our proposal to change? And he said in that conversation that the conflicting nature of the literature does not provide a clear path forward and more time will be needed for the FDA to formulate a formal opinion on the issue of precaution around these data. So couldn't Merck have responded to that with a CBE? No, because he's saying, then you have the email, Your Honor, that you were mentioning earlier, which came a short time later, which said, asked us to hold off, and I think it's clear to get the full quote, and this is the FDA email, that they would need to work with Merck to, quote, decide on language for a warning and precaution, atypical fracture language,  Then you go to the letter, I'm sorry, Your Honor. They did that, didn't they? They sent the letter with a suggestion or a proposal. Well, Your Honor, I think that letter needs to be read in the context of saying, Is that the one you mentioned? This is the complete response. There's a problem with Merck's use of the term stress fracture. Well, the letter says several things. It starts by saying that the justification for the change we want to make is inadequate, which is what is being said here. The science isn't there at that point. Yes, they were raising issues about stress fracture issues and so on, but, Your Honor, you have to take account of the fact they also had language problems with our adverse reaction section, and they just said, Here, change this. They didn't do that with this section because, as the record indicates, they had a problem whether the science supported making a change in that section. So what about the appellants hit the letter at A1500 really hard? So that's all you need. What's your position on that? That's what I'm talking about, Your Honor, and I don't think the letter says that. I think it says the science is lacking first and foremost. Yes, they raised issues about the language, but you have to read that letter for what it is, and in the context is the other communications from the FDA saying, We're not ready to move on this yet. Your Honors, you also have to take account of the fact that after Levine, Congress passed an amendment to the Act, 50504, that said that if the FDA becomes aware of new safety information that it, quote, believes should be included in the labeling of the drug, the agency shall promptly notify the sponsor. And it has a very detailed provision in there that explains the FDA is supposed to tell the manufacturer to make a proposal and then go back and work with them to change the proposal in a very tight time frame. They didn't do that here at this point. That's exactly what they did when the ASBMR report came out, which they said is new evidence that justified the change. That happened later. So this is entirely consistent with the record that we're laying out that they would not have, this is clear evidence that they would not have proved this earlier because they didn't move forward under 50504 at this point. You know, this record, and it's sizable, has a lot of reports from different scientists and is that sort of, a lot of these independent reports sort of beside the point? Aren't we supposed to look at what the FDA might or might not do? Well, Your Honor, I think it's important, though, to look at these other reports because, as several of you mentioned, the March 10 statement by the agency is also critical on this issue because it did say at that point the data it had received, and it's referring at that point to the data that it received from all manufacturers including Merck. And it said it didn't show a clear connection. And indeed, incidentally, you can see causality doesn't have to be shown here, right? I mean, it's something less than that. The standard is they have to find reasonable evidence of a causal association. That's what we're talking about. But bear in mind in that statement Even today, the labeling doesn't say there's a causal relation, right? That's right. But that's the test that the agency was looking for, but it flatly said in the press release you all have mentioned this is a 1508, A1508, the FDA's review of these data did not show an increase in this risk in women using these medications. This was all the data that everyone had submitted at that point. And then they said we're going out to work with these independent groups that you're talking about, particularly the ASBMR to see if we can sort this out. And then when the ASBMR report came out several months later, then the FDA sprung into action, invoked 50504, said this is new evidence that justifies making the change and here's the change that we want you to make. And I think this is clear evidence that they would not have urged this change, would not have approved this change earlier. So which documents provide the best proof that there was clear evidence that the FDA would have said no? I think it's the internal memo A1970 that I referenced earlier that talks about the conversation that they had with Dr. Monroe. And I also want to note that in that document, the FDA also, Dr. Monroe also told Merck that they wanted to approach the issue of giving a precaution from the perspective of all manufacturers. That's another reason they were saying wait. They didn't want to do this separately for Merck alone. Merck was the only manufacturer that had proposed anything. And that's another clear reason why the FDA would not have approved the change at this point is because they were looking at this on an industry-wide basis. On that point, again, whether there is clear evidence that the FDA would not have approved. I go back to this idea and I think that Judge Chigaris mentioned it. This is a summary judgment. You give the party opposing the motion the benefit of all reasonable inferences. Why isn't this a jury issue as to whether the FDA would have or would not have approved? It's not. I think this is the question of whether there is preemption. Again, I would urge the  to make an appeal to this court and whether there's federal jurisdiction about jurisdictional amount. I know you say it's not, but why is it not? It seems to me a typical question   there's clear evidence or not. Is it or is it not? It's because it is not. It's a question of law and this court needs to look at the  It seems to be something within a province of a jury and wouldn't the 7th amendment be violated if we took that from your friends? If the court goes that direction I think it's deviating from the circuit that says this is a question of law. Also your honor we also need to take account of the fact there have been a lot of preemption cases decided out there. No one puts this to the jury. In none of the cases that anybody has cited has this question ever been put to a jury. It is a burden of proof. I don't think it's a burden of proof. It probably stems from clear and convincing evidence. It is a determination to be made by a court. You could put that to a jury as well. It's a determination made by the court. That's what the circuit has consistently said. I think you also have to look at the fact either a situation is preempted or dismissed  whether that distinction may be resolved on this issue. If we send these cases back and put this question to the jury in each one, you'll get different answers. What about the state claims? What do we   these claims? The plaintiffs have been properly dismissed as well. I think with respect to the claims that are there that are based on the adverse reactions argument, as we noted in the briefs, half of the claims that are there that doesn't work because there was a change made to the adverse  portion of the label midway through the period. So half of the plaintiffs don't have that argument. Do you want to elaborate on that? How are these failure to warn claims related to failure to warn? If you look through the only experts that were proffered on this, none of them had a failure to warn claim. I don't know if there was a failure to warn claim. I don't know if there was a failure to warn claim. I don't   evidence obviously that there might have been a failure to warn claim. So I don't know if there was a failure to warn claim. I don't know if there was a failure to warn  I don't know if there was a failure to warn claim on this case. I believe it was Mr Fredrick but he did say that the judge took one statement from one litigant and used that to dismiss all of the non warning claims. Could you respond to that? Your Honor, that is I don't think accurate. Every plaintiff in the case with their counsel had the opportunity to come forward and say whatever they wanted to say with respect to here is my design defect claim with respect to the adverse reactions claim they were offered the opportunity to say here is my doctor and if my doctor had seen this he wouldn't have prescribed the drug. They put in a 500 page exhibit describing each of these claims indicating a lot of discussion with the doctors for example but none of them said had the adverse reactions provision been put in earlier that would have changed their decision about prescribing the drug. Your Honor, it did not because it basically did not reverse the four motions that Merck had already filed as being the summary judgment motion which the court determined took it far enough to shift the burden and everyone was allowed to respond. Classic compliance with Rule 56. Thank you, Your Honor. Thank you, Mr. Bierstein. Mr. Frederick. Let me start with the question that judges asked about the best evidence he has and that's this April 9th telephone conversation. These notes which are at page A, 1970 to 71 were written by a Merck scientist five weeks before the complete response letter. So these are notes. We don't know whether this is a verbatim transcript. We only know that these are the Merck person's notes. But even those notes and talking about the conflicting nature of the literature, we would concede that there is conflict in the literature. Our point is that the best evidence in the literature said there was a problem with atypical femur fractures. That's why even that conversation, even if it is accurately transcribed, can't be clear evidence that the FDA was rejecting, particularly in the regulatory context when five weeks later the FDA is charged with giving all deficiencies in the label that Merck has identified and it doesn't use the word science in that letter. It's talking about the language. It says, quote, your justification for the proposed precaution section language is inadequate. Identification of stress fractures may not be clearly related to the atypical fractures that have been reported in the literature. So the best thing that my friend can say cannot be clear evidence. Judge Fuentes, you asked about the standard. I think the best articulation is what we put in page 7 of our reply brief where we said, quote, only where the FDA is unequivocal that it is rejecting a warning because of lack of reasonable scientific evidence of a causal association between the drug and the medical risk, does the rejection constitute clear evidence that the FDA would have rejected any warning of the medical risk? That is distilled from where we think the cases are, but as an articulation of what the standard is, I think that's the best that we can do in these circumstances. Tell me what you think the appropriate warning is that Merck should have submitted. Well, A, we don't have to do that as plaintiffs. Our burden, and this is a  important question, is hypothetically since Merck never presented a proper label, how are we to determine? And that's why when the Supreme Court says this impossibility preemption is such a demanding defense, we have a hypothetical here. We don't know what the FDA would do  prevent this from happening. I don't think you would reject those because the judge in the Glenn case didn't decide the design defect claim on the basis of preemption. What the judge did once we presented to the judge the 500 or so other cases for which there had not been discovery, that there are design defect claims, there are these other kinds of claims, and the judge realized he couldn't cover them with preemption like the adverse reactions. So he tried to sweep them in and say that we lost on summary judgment there. I've never been in an appeal where the judge ruled against a claimant on summary judgment where you didn't even get discovery on your claims. And there was a 45-day scramble to try to create a record to satisfy the judge's orders. All the non-mourning claims have been dismissed. All of the claims. Basically this case is finished. For every claimant, your honor, every claim, and these can't be class cases because of the Amchem versus Windsor case. So that's why there was no master complaint here. There was a series of complaints, there was a liaison counsel, but this was all a series of individual cases where these people, mostly women, post-menopausal women, were complaining that they had suffered these catastrophic bone breakages and they were trying to get redressed for that. What do you make of Mr. Beiser's argument, it's all over the table. The judge decided to tee up an order to show cause and decide preemption after the jury had already ruled against Mrs. Glenn. So the judge promptly decides to rule gratuitously in the Glenn case that the claims were preempted after the jury had already rejected them and then triggered an order to show cause proceeding at Merck's behest. So all of these cases had not gone  through the handling of this multidistrict litigation case. How long was discovery open? Well, as I understand it, the discovery was open for six months, but during this period, there was no discovery. We were putting in declarations to say if we were permitted discovery, this is what we would be trying to show. And it was a 45-day scramble among counsel for 500. Prior to that 45-day window, from the time the first complaints were docketed, how much time     did it take in order to get what it couldn't win in the Wyeth case itself? And that's by having the FDA given bits of information and his invocation of the 2007 amendments is not correct because in those amendments, even where the FDA can require a label change, it does not displace the CVE regulation. Specifically by statute, it says that the CVE regulation stays in place. So the burden is always on the manufacturer to keep its label